Michael LEBRON, Plaintiff,

v.

WASHINGTON METROPOLITAN
AREA TRANSIT AUTHORITY,
Defendant.

Civ. A. No. 84–78.

United States District Court,
District of Columbia.

March 5, 1987.

Donald Weightman, Alan J. Roth, Harry H. Voight, Washington, D.C., for plaintiff.

Thomas Fortune Fay, Carol A. Sigmond, Washington Metropolitan Area Transit Auth., Asst. Gen. Counsel, Washington, D.C., for defendant.

## MEMORANDUM OPINION

STANLEY S. HARRIS, District Judge.

This case had its inception, as plaintiff Michael Lebron testified, when he decided in 1983 that it would be "funny" to prepare and display a photomontage. While it is difficult to characterize it verbally, it apparently sought to portray President Reagan and other government officials as insensitive. Now, years later, the case is before the Court on Lebron's petition for costs and attorneys' fees, and motion for summary judgment on the issues of damages.

In 1984, Lebron filed suit in this Court contesting the refusal of the Washington Metropolitan Area Transit Authority (WMATA) to rent space in WMATA's subway stations for the display of the political poster which WMATA concluded was deceptive. Lebron's suit, brought under 42 U.S.C. § 1983, alleged that WMATA's refusal abridged his rights of free expression under the First Amendment, and sought both injunctive and compensatory relief. After a consolidated preliminary injunction hearing and trial on the merits, this Court denied Lebron relief. *Lebron v. Washington Metropolitan Area Transit Authority*, 585 F.Supp. 1461 (D.D.C.1984). Lebron appealed to the United States Court of Appeals for the District of Columbia Circuit, which reversed this Court's judgment, allowing Lebron to obtain the injunctive relief he sought. *Lebron v. Washington Metropolitan Area Transit Authority*, 749 F.2d 893 (D.C.Cir.1984). The only substantive issue remaining before this Court is the issue of damages. Additionally, as a "prevailing party," Lebron has requested attorneys' fees pursuant to 42 U.S.C. § 1988.[1]

### Attorneys' Fees

Section 1988 of Title 42 of the United States Code provides that in federal civil rights actions "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." Although the statutory language indicates that fee awards are not mandatory, Congress intended that a prevailing plaintiff "should ordinarily recover an attorney's fee unless special circumstances would render an award unjust." S.Rep. No. 1011, 94th Cong., 2d Sess. 4, *reprinted in* 1976 U.S. Code Cong. & Ad.News, 5908, 5912 (quoting *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968)). WMATA does not contest Lebron's entitlement to an award

---

1. As has become regrettably commonplace, the dispute over attorneys' fees has consumed more of this Court's time and resources than the underlying controversy did. Illustratively, this Memorandum Opinion is more than twice as long as the original one on the merits.

under § 1988, but does challenge the amount to be awarded.

The Supreme Court has concluded that the "starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). This value, the "lodestar," will normally represent the reasonable fee, but the amount may be adjusted upward or downward to reflect rare and exceptional circumstances. *Blum v. Stenson,* 465 U.S. 886, 897, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984). WMATA challenges Lebron's proposed hourly rates, the number of hours expended on the litigation, and Lebron's request for an upward adjustment of the lodestar.

## I.  *Litigation on the Merits*

### A.  *The Reasonable Hourly Rate*

The Court should attempt to fix the "reasonable hourly rate" as close as possible to "the prevailing market rates in the relevant community." *Blum,* 465 U.S. at 895, 104 S.Ct. at 1547. In determining the market rate for the services of an attorney in private practice, the attorney's customary billing rate will provide a presumptive measure. *Laffey v. Northwest Airlines, Inc.,* 746 F.2d 4, 18–25 (D.C.Cir.1984), *cert. denied,* 472 U.S. 1021, 105 S.Ct. 3488, 87 L.Ed.2d 622 (1985); *National Association of Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319, 1325 (D.C.Cir. 1982).

Lebron has had several attorneys involved in his case, each of whom is in private practice. Messrs. Weightman and Roth handled the litigation on the merits, and Messrs. Voight and Strauss were engaged to handle the fee petition. Weight-man, Roth, and Strauss practice at a firm which maintains a two-tiered fee schedule, with work for public and non-profit clients billed at a lower rate than work for ordinary clients.[2] According to the lower fee schedule, Weightman's time was billed at $57 per hour prior to February 1984, at $65 per hour during the remainder of 1984, and at $75 per hour during 1985. Roth, a partner in the firm, charged $115 per hour in 1983 and 1984, and $130 per hour in 1985. Strauss' time was billed at $75 per hour in 1985. Voight, who was retained solely to prepare the fee petition, billed his time at $250 per hour in 1985.

WMATA does not challenge the accuracy of these figures, but argues that they are nevertheless an inappropriate measure because none of the attorneys customarily practiced in the area of First Amendment law. In fact, Lebron's attorneys' principal area of expertise appears to be public utility ratemaking. However, the Court finds, on the basis of other available evidence concerning the market rate for complex federal litigation, that the billing rates suggested for the underlying litigation are reasonable.[3] First, the findings of the district court in *Laffey v. Northwest Airlines, Inc.,* 572 F.Supp. 354, 371–72 (D.D.C.1983), *rev'd on other grounds,* 746 F.2d 4 (D.C.Cir.1984), *cert. denied,* 472 U.S. 1021, 105 S.Ct. 3488, 87 L.Ed.2d 622 (1985), regarding the prevailing rates in this community for complex federal litigation indicate that the hourly rates proposed here by Lebron are slightly lower than those charged by civil rights litigators with comparable years of experience. Second, a survey of the billing rates of a number of larger local firms for "litigation," based on the National Law Journal's 1984 *Directory of the Legal Profession,* reveals that the fee schedule proposed by Lebron would be at the low end of the range. Although the

---

**2.** Lebron does not challenge the applicability of the lower fee schedule.

**3.** The Court rejects WMATA's suggestion that this case should not be considered complex federal litigation. Although the issues may be stated rather succinctly, the application of First Amendment doctrine to this novel situation involved sophisticated legal analysis. The history of this case demonstrates the inherent complexity of First Amendment cases; not only was the conclusion reached by the Court of Appeals different from this Court's, but Judges Bork, Scalia, and Starr disagreed among themselves as to the proper grounds for decision. *See Lebron v. WMATA,* 749 F.2d 893 and 898–99.

broad classification "litigation" is less helpful than would be a breakdown according to type of case, *Concerned Veterans*, 675 F.2d at 1325, the totality of the available data persuades the Court that the hourly rates suggested by Lebron are within the range customarily charged in this community for such work.

Moreover, while WMATA correctly has noted that Lebron's data are not exactly indicative of the appropriate market rate, WMATA has failed to provide anything more than speculation to support its challenges. Once Lebron provided hard evidence on his attorneys' customary billing rates, and evidence on the prevailing rates for similar work, the burden shifted to WMATA to present specific evidence that the proposed rates are erroneous. *Concerned Veterans*, 675 F.2d at 1326. The "reasonable hourly rate" is a highly elusive creature, *e.g.*, *Blum*, 465 U.S. at 895 n. 11, 104 S.Ct. at 1547 n. 11, and without specific evidence indicating that a lower rate is appropriate, Lebron's showing is sufficient. However, WMATA's broader argument that Lebron's attorneys should not be able to charge the hourly rates of experienced civil rights litigators, while simultaneously expending an inordinate amount of time to familiarize themselves with unfamiliar legal subject matters, is well taken. *See Laffey*, 746 F.2d at 22. Therefore, the Court accepts Lebron's proposed fee schedule, but reviews Lebron's time records in the context of comparably experienced civil rights litigators, and strikes hours that appear to be based on counsel's relative inexperience with this area of the law.

## B. *Reasonable Hours*

The second element in the lodestar formula is the number of hours reasonably expended on behalf of the prevailing party. To determine the number of hours reasonably expended, the Court must first determine the particular services for which Lebron is entitled to attorneys' fees. In this case, the parties disagree over Lebron's right to recover the cost of his attorneys'

pre-litigation negotiations with WMATA, and for certain claims upon which Lebron did not ultimately prevail. Once the compensable services are identified, the Court examines the amount of time expended on each to ensure that a reasonable number of hours is claimed.

### 1. *Compensable Services*

■ Lebron's fee petition includes 22.25 hours spent in pre-litigation efforts to persuade WMATA to accept his poster. These hours included basic research on the potential First Amendment issues as well as research on WMATA's advertising policies. The Supreme Court addressed the compensability of time spent pursuing administrative relief in *Webb v. Board of Education of Dyer County*, 471 U.S. 234, 105 S.Ct. 1923, 85 L.Ed.2d 233 (1985), and concluded that time spent pursuing optional administrative relief ordinarily would not be compensable under 42 U.S.C. § 1988. *Id.* at 1928. The Supreme Court did note, however, that portions of such work would be compensable to the extent that the effort "was work that was both useful and of a type ordinarily necessary to advance the civil rights litigation...." *Id.* at 1929. Accordingly, the Court will allow Weightman's hours devoted to initial research and client interviews (9.5 hours), but will reduce the compensable hours devoted to correspondence with WMATA from 12.75 hours to 6 hours.[4] This reduction represents the Court's effort to separate the compensable time spent obtaining necessary information from WMATA and building a record for future judicial review from the non-compensable time spent pleading Lebron's case before WMATA personnel.

WMATA also challenges Lebron's entitlement to fees related to several claims upon which Lebron did not prevail at trial or appeal. First, WMATA argues that the lodestar should not include hours devoted to Lebron's claims against individual defendants, because Lebron ultimately prevailed only on his claims against WMATA. Second, WMATA challenges Lebron's sub-

---

**4.** The court also disallows the $170.52 in costs sought in connection with the administrative phase of the case because Lebron's description

makes it impossible to determine whether any portion of that amount represented expenses incurred in preparation for litigation.

mission of hours devoted to an unsuccessful effort to have the Court impose sanctions on WMATA pursuant to Fed.R.Civ.P. 11.

In *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the Supreme Court explained the process to be used by courts in determining whether a party has "prevailed" on a particular claim. When a prevailing party seeks attorneys' fees for time spent on unsuccessful claims, two considerations are relevant: the legal and factual relation of the unsuccessful claims to the successful claims, and the moving party's overall degree of success. *Id.* at 435, 103 S.Ct. at 1940. When a group of claims involves "a common core of facts or ... related legal theories," it would be improper to view the suit "as a series of discrete claims...." *Id.* Similarly, when a party has received "excellent results," courts should not unduly penalize the party for pursuing that relief on alternative grounds. *Id.* "Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters." *Id.*

▉ Both of the *Hensley* factors support inclusion of the hours spent on Lebron's individual claims. Although eventually dismissed, the claims sought the same relief sought under Lebron's successful claim against WMATA and were based on the same set of facts and legal theories, as were the successful claims. The only difference between the individual and institutional claims was the defendants' amenability to suit. Therefore, the individual claims are sufficiently related to the institutional claims to support inclusion in the fee award. *Cf. City of Riverside v. Rivera*, 477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986) (upholding award of attorneys' fees for time spent on individual claims, even though dismissed on summary judgment).

▉ The unsuccessful motion for sanctions presents a more attenuated case. During the original litigation in this Court,

WMATA failed to file a timely opposition to a motion by Lebron. The Court denied Lebron's request for sanctions and granted WMATA a short extension of time within which to file its opposition. While the sanctions motion was "related" to Lebron's substantive claims, its legal and factual basis was not so intertwined that an independent determination of Lebron's success would be impractical or unjust. Nor is this the case of a collateral motion intended to enforce or expand the scope of relief ultimately available to the successful party. *See Laffey*, 572 F.Supp. at 363; *Blake v. Hoston*, 513 F.Supp. 663, 666 (D.D.C.1981). Consequently, the motion must stand on its own merits. Although Lebron contends that the motion was successful because WMATA thereafter adhered to the Court's time limits for filings, the Court concludes that Lebron should not be considered a "prevailing party" with respect to his sanctions motion and the 9.25 hours (three hours of research and 6.25 hours of drafting) thus expended by Weightman should be stricken.

### 2. *Reasonableness of Hours*

As noted above, a major concern in this case is the relative inexperience of Lebron's counsel in litigating First Amendment cases. Prior to this case, Lebron's attorneys had practiced primarily in the area of public utility ratemaking, and admittedly took on this matter in a *pro bono* capacity. Although it is fine that Weightman and Roth made their services available in a case which if unsuccessful, would have provided no fee, the Court must take account of the fact that they volunteered to enter a relatively unfamiliar area of the law. *Laffey*, 746 F.2d at 22. If Lebron's attorneys are to be compensated at the market rate for First Amendment litigators, they may be compensated only for the number of hours that a First Amendment litigator, with a comparable number of years of experience, would take to complete a particular task. The Court has a duty to scrutinize the record and strike "hours that are 'excessive, redundant, or otherwise unnecessary....'" *Murray v.*

*Weinberger,* 741 F.2d 1423, 1427 (D.C.Cir. 1984) (quoting *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1940).

The Court notes at the outset that Lebron's attorneys have facilitated review of the record by providing detailed chronologies of how they spent their time litigating this case. This day-to-day record, compiled from the attorneys' contemporaneous time records, allows the Court to assess the reasonableness of the time spent on particular tasks. *See National Association of Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319, 1327 (D.C.Cir.1982). The Court addresses WMATA's challenges according to the categorical groupings used by WMATA in its opposition.

### a. *Pretrial and Trial Preparation*

Weightman claims 16 hours in preparation for and attendance at the hearing on the temporary restraining order, and 41.75 hours in preparation for and attendance at the consolidated preliminary injunction hearing and trial on the merits. WMATA challenges the time as excessive, claiming that Weightman has attempted to charge for the time spent on "self-education." WMATA requests reduction to four hours for the TRO hearing work and 10 hours for the trial work. The Court does not find 16 hours to be an excessive amount of time to spend in performing preliminary research, preparing for, and arguing a TRO motion, especially since Weightman's supervising partner has submitted only 0.25 hour for his involvement in preparing for the TRO hearing.

However, upon reviewing the record, the Court concludes that a portion of Weightman's time spent preparing for the trial is attributable to his lack of familiarity with constitutional litigation. Although Weightman is not expected to exercise the skills of a First Amendment expert, he is expected to exercise the skills of a second-year associate practicing as a First Amendment litigator. Accordingly, the Court concludes that Weightman's time spent in "strategy sessions" should be reduced from 7.25 hours to 4.5 hours, his time spent preparing

and reviewing case materials should be reduced from 18.5 hours to 12 hours, and his time spent interviewing potential witnesses should be reduced from 6.5 hours to 4 hours. The total time claimed thus is reduced from 41.75 hours to 30 hours.

Roth, the supervising partner, devoted a total of 15 hours to the case between December 2, 1983, and trial on February 9, 1984. WMATA does not challenge the reasonableness of that time, and the Court concludes that 15 hours is reasonable.

### b. *Research*

Legal research represents a significant portion of the total hours claimed by Weightman—85.75 hours on matters before the trial court and 123.25 hours at the appellate level—as well as the area in which a lack of experience in First Amendment litigation is most likely to have affected attorney efficiency.[5] Although this case should not be considered simple, the Court believes that research time would have been considerably less if at least some of the experience of Weightman and Roth had been in First Amendment litigation rather than in public utility ratemaking.

Therefore, the Court concludes that legal research hours between the TRO hearing and trial should be reduced from 73.25 hours to 40 hours, and research hours for the proposed findings of fact should be reduced from 9.25 hours to 4.5 hours. With respect to the appeal, research on injunctions pending appeal should be reduced from 43 hours to 20 hours, and research for the appellate briefs should be reduced from 93 hours to 40 hours. The Court does not understand, nor does Lebron's fee petition make particularly clear, why an additional 93 hours of research were required to brief for the Court of Appeals essentially the same issues which were considered at the trial level. Research hours for the supplemental mootness brief should be reduced from 28.75 hours to 20 hours.

WMATA also challenges 25 hours of law clerk research on the issues of qualified

---

**5.** The claimed trial court figure includes 9.25 hours of research devoted simply to the proper form of proposed findings of fact and conclusions of law.

and sovereign immunity, on the grounds that this research involved individual claims upon which Lebron did not prevail. The Court rejected this argument above, and thus the hours are not inappropriate on those grounds. Moreover, the Court notes that research on sovereign immunity would have related to WMATA, not the individual defendants. Therefore, the 25 hours of law clerk time will be approved.

### c. Drafting

WMATA also challenges Lebron's attorneys' hours for drafting pleadings and other papers. Weightman claims 86.25 hours drafting and editing the pleadings before the trial court, 27.25 hours drafting proposed findings of fact and conclusions of law, 61.25 hours drafting pleadings seeking an injunction pending appeal, 24.5 hours drafting the reply brief, and 23 hours drafting the supplemental mootness brief. Clearly, 222.25 billable hours, the equivalent of six or seven solid weeks worth of work, is an excessive amount of time to spend drafting the pleadings in this case. Although it is likely that this was primarily due to the fact that Weightman was only a first- or second-year associate, a portion of the inefficiency must be traced to his and Roth's inexperience in the First Amendment area. Accordingly, the Court believes that the trial court drafting time should be reduced to 65 hours, the proposed findings of fact and conclusions of law time should be reduced to 20 hours, and the pleadings for an injunction pending appeal should be reduced to 45 hours. The drafting hours for the appellate briefs are reasonable and will not be reduced.

Roth devoted a total of 12.5 hours to reviewing and editing the motions for injunction pending appeal and the appellate briefs. WMATA does not challenge this total (except to draw reference to the great disparity between Roth's time and Weightman's time) and the Court finds that it is reasonable.

### d. Oral Argument

WMATA challenges Weightman's claim of 25 hours and Roth's claim of nine hours preparing for and attending oral argument before the Court of Appeals. Weightman actually recorded a rather remarkable 76.5 hours preparing for the argument (almost two full 40–hour weeks), but excluded 51.5 hours in the exercise of billing judgment. The Court finds that 23 hours is not an unreasonable preparation time for a second-year associate about to argue a case before a United States Court of Appeals, and seven hours is not an unreasonable amount of time for the supervising partner. The Court will, however, strike Roth's claim for 0.75 hours to "evaluate" Weightman's oral argument, and Weightman's claim for 2.25 hours to "review" the oral argument. Those costs are not appropriately passed on to a client or, in this case, to the losing party.

### e. Allocation of Tasks

WMATA objects to Weightman's performance of tasks that arguably could have been performed less expensively by paralegals. When a fee petition is based on a firm's normal billing rate, a court should be hesitant to challenge an allocation of tasks that is consistent with the firm's normal staffing practice. *Laffey,* 746 F.2d at 25–26. Here, WMATA challenges Weightman's claim of 1.25 hours spent filing the complaint and amended complaint, 15.75 hours spent assembling record cites for the proposed findings of fact and conclusions of law, and 19.25 hours spent assembling record cites for the appellate brief. Weightman concedes that a portion of the time spent assembling record cites was devoted to proofreading, but claims that a large portion was devoted to discretionary selections that must be performed by the attorney. Clearly, the filing of documents with the Court should be delegated to support staff. Likewise, the proofreading of documents for typographical errors should be delegated. Therefore, the Court will allocate the 1.25 filing hours and seven of the remaining hours to paralegal work.

Lebron claims an additional 32.5 hours of law clerk time for cite checking and research, and 10 hours of paralegal time. WMATA's only challenge to these claims is with respect to 25 hours of law clerk research related to claims against the individual defendants. Because the Court must

reject WMATA's argument that the individual claims are "unrelated" to the institutional claims and therefore non-compensable, these hours will be included in the fee award. Accordingly, Lebron will be awarded fees for 32.5 hours of law clerk time and 18.25 hours of paralegal time.

### f. *Miscellaneous*

Weightman claims eight hours and Roth claims 1.5 hours in connection with settlement negotiations. These hours are not excessive, and will be approved. Additionally, Weightman's fee submission includes 28.25 hours for conferences with Lebron and other attorneys, 14.25 hours spent reviewing WMATA's pleadings and this Court's orders, and three hours to draft minor pleadings. Roth claims a total of 8.25 hours for general supervisory tasks during the time period between the denial of the TRO and the final decision in the Court of Appeals. WMATA does not seriously challenge these claims and the Court finds them reasonable.

### 3. *The Lodestar*

The lodestar for Weightman's and Roth's work on the merits is calculated as follows:

| Services | Attorney | Rate | Hours | Total |
|---|---|---|---|---|
| Administrative work useful and necessary to litigation | Weightman | $ 57 | 15.5 | $ 883.50 |
| Preparation for and attendance in court | Weightman | 57 | 20.0 | 1,140.00 |
| | " | 65 | 35.0 | 2,275.00 |
| | Roth | 115 | 24.0 | 2,760.00 |
| Research | Weightman | 57 | 40.0 | 2,280.00 |
| | " | 65 | 84.5 | 5,492.00 |
| | law clerks | 35 | 32.5 | 1,137.50 |
| Drafting | Weightman | 57 | 65.0 | 3,705.00 |
| | " | 65 | 112.5 | 7,312.50 |
| | Roth | 115 | 12.5 | 1,437.50 |
| Conferences, review of pleadings, drafting | Weightman | 57 | 31.25 | 1,781.25 |
| minor pleadings | " | 65 | 14.25 | 926.25 |
| | Roth | 115 | 8.25 | 948.75 |
| Settlement negotiations | Weightman | 65 | 8.0 | 520.00 |
| | Roth | 115 | 1.5 | 172.50 |
| Document handling | paralegal | 32 | 18.25 | 584.00 |
| | | | | $33,356.25 |

## II. *Fee Award Litigation*

### A. *The Reasonable Hourly Rate*

■ Weightman and Roth assigned the preparation of the fee petition to Scott Strauss, an associate at their firm, and Harry Voight, a partner at a different firm. Strauss claims an hourly rate of $75 per hour, and Voight claims a rate of $250 per hour. WMATA does not challenge Strauss' rate, but challenges Voight's rate as excessive. The Court agrees with WMATA. Voight, like Weightman and Roth, specializes in public utility work. Prior to his work on this case, Voight had never litigated a First Amendment case, or even a § 1983 case. Moreover, Voight had no experience in preparing fee petitions, though other members of his firm had worked in that area. An hourly rate of $250 per hour for the rather mechanical work of preparing a fee petition is egregiously excessive.

Lebron bears the burden of establishing the prevailing market rate for fee petition work. Where the evidence is inadequate, a court will "reduce the award accordingly." *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983); *see also National Association of Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319, 1325–26 (D.C.Cir.1982). Here, Lebron has done nothing more than present Voight's normal hourly rate for

public utility work.[6] As noted above, this showing fails to satisfy the Court. Consequently, the Court is left without a reliable rate at which to bill Voight's time. To fill that void, and to avoid reigniting the fee conflagration in this case, the Court sets Voight's rate at $75 per hour, the presumptive figure established by the Equal Access to Justice Act.[7]

### B. Reasonable Hours

WMATA does not challenge Strauss' hours, but challenges hours submitted by Voight, Roth, and Weightman. With respect to Voight's claims, WMATA alleges that his hours should be reduced to take account of time spent familiarizing himself with background matter on fee petitions. The Court agrees that Voight should not have submitted a request for time spent reading the *Laffey* decision and a New York City Bar Association report on fee awards. Voight's hours should be reduced from 12.75 hours to 10.5 hours. Strauss' claims for 40.75 hours will be approved.

The work by Weightman and Roth on the attorneys' fee issue may be divided into two phases: settlement negotiations and litigation. Weightman claims nine hours related to settlement negotiations and 10 hours related to preparation of the fee petition. Roth claims 8.75 hours on settlement work and 17.75 hours on the fee petition.

WMATA claims that the hours submitted for settlement work are excessive when compared to the hours devoted by WMA-TA's counsel in response to Lebron's proposal. However, the Court believes the hours claimed are reasonable. Compiling the necessary data is a time-consuming task, one which WMATA did not have to perform. Moreover, parties must be encouraged aggressively to pursue settlement of attorneys' fees claims, to avoid—as obviously has occurred here—"a second major litigation" in the case. *Hensley v. Eckerhart*, 461 U.S. at 437 (1983); *see also Laffey*, 746 F.2d at 29–30. However, Weightman and Roth may not, once they have delegated the fee petition work, claim hours for the same tasks that Strauss and Voight were responsible for performing.

In reviewing the time records submitted by Weightman and Roth, the Court finds that Weightman's hours on the fee petition should be reduced from 10 hours to eight to reflect elimination of time spent drafting and editing the work of Strauss and Voight. Weightman may be compensated for the time spent preparing his own affidavit in support of the fee request and in ensuring the accuracy of the petition's claims, but may not claim compensation for work properly performed by other counsel. Likewise, the Court finds that Roth's hours should be reduced from 17.75 hours to 12 hours to eliminate redundant work.

### C. The Lodestar

Accordingly, the lodestar for the work on the fee petition is as follows:

| Services | Attorney | Rate | Hours | Total |
|---|---|---|---|---|
| Settlement negotiations | Weightman | $ 65 | 1.25 | $ 81.25 |
| " | " | 70 | 7.75 | 542.50 |
| | Roth | 115 | 7.25 | 833.75 |
| | Roth | 130 | 1.5 | 195.00 |
| Preparation of fee request | Weightman | 70 | 8.0 | 560.00 |
| | Roth | 130 | 12.0 | 1,560.00 |
| | Strauss | 75 | 40.75 | 3,056.25 |
| | Voight | 75 | 10.5 | 787.50 |
| | | | | $ 7,616.25 |

---

6. Lebron alleges that the affidavit of Daniel A. Rezneck, attached to his fee petition, provides independent support for Voight's hourly rate. Lebron is incorrect; Rezneck's affidavit concerns rates for complex federal litigation and makes no mention of the market rate for fee petition preparation.

7. The crippling growth in attorneys' fees litigation is a direct consequence of the fact that while Congress has enacted scores of fee statutes, it is this Court's belief that in only three—the Criminal Justice Act and two civil statutes—has it seen fit to specify hourly rates. *See* 5 U.S.C. § 504(b)(1)(A); 28 U.S.C. § 2412(d)(2)(A).

### IV. Costs

Lebron includes a request for court costs of $1,754.92, $205.60 awarded by the Court of Appeals for out-of-pocket costs, and $4,387.66 in litigation-related expenses. Reimbursement for court costs is authorized by 28 U.S.C. § 1920, and the rule in this circuit is that "attorneys' fees" includes those costs ordinarily passed on to clients by the attorney submitting the claim. *See Laffey*, 746 F.2d at 30. However, Lebron is not entitled to the $170.52 in costs attributable to the administrative phase of the case because he has failed to meet his burden of showing that the costs were necessary and useful to later litigation. Therefore, the Court adds $6,177.66 to the lodestar.

### V. Adjustments to the Lodestar

Lebron requests two upward adjustments to the lodestar. First, he requests that the lodestar be increased by 25 percent to reward Weightman and Roth (and apparently Strauss and Voight, too) for their allegedly extraordinary success in the litigation. Second, Lebron contends that this adjusted lodestar should be enhanced by an additional 9.17 percent due to the delay in receiving payment.

This circuit recognizes three factors which may warrant an upward adjustment of the lodestar: "(1) unusually good representation by counsel, taking into account the level of skill normally expected; (2) the risk that no fee will be paid; and (3) a delay in the receipt of payment." *Murray v. Weinberger*, 741 F.2d 1423, 1429 (D.C.Cir. 1984) (footnote omitted); *see also Concerned Veterans*, 675 F.2d at 1328; *Copeland v. Marshall*, 641 F.2d 880, 892–94 (D.C.Cir.1980) (en banc). Absent specific evidence demonstrating rare and exceptional circumstances, the Court must presume that the lodestar figure will provide " 'a fully compensatory fee'...." *Murray*, 741 F.2d at 1428 (quoting *Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940).

■ Lebron bases his request for a 25 percent enhancement on the first two factors enumerated in *Murray*—exceptional results and the contingent nature of recovery. The Court finds neither basis persuasive. Although the First Amendment issue implicated in this case can be considered complex, "[t]he novelty and complexity of the issues presumably were fully reflected in the number of billable hours recorded by counsel and thus do not warrant an upward adjustment" of the lodestar. *Blum v. Stenson*, 465 U.S. 886, 898, 104 S.Ct. 1541, 1549, 79 L.Ed.2d 891 (1984). The fact that Weightman and Roth prevailed on appeal, rather than at trial, is irrelevant. Similarly, Lebron's success in obtaining injunctive relief pending appeal, while indicative of success, was related more to the nature of the case than to allegedly extraordinary skills of his attorneys. Finally, this is not the sort of case where the plaintiff's success has resulted in significant benefits to a broad segment of society, which might justify compensation in excess of the normal hourly rate. *See, e.g., Blum v. Stenson*, 512 F.Supp. 680, 685 (S.D.N.Y.), *aff'd mem.*, 671 F.2d 493 (2d Cir.1981), *rev'd on other grounds*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). This simply is a case in which a plaintiff received good representation and won. There is "[a] strong presumption" in favor of the lodestar figure, *Pennsylvania v. Delaware Valley Citizens' Council For Clean Air*, — U.S. —, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986), and nothing in the record suggests that the lodestar will fail to provide counsel with reasonable compensation for their efforts.[8]

---

**8.** The Court is baffled by Lebron's request for enhancement of the hours devoted by Strauss and Voight to preparation of the fee petition. Those attorneys became involved in the case only after Lebron had prevailed in the Court of Appeals, and therefore did not face the uncertainty of payment that Weightman and Roth faced when they accepted the case. Moreover, the Court finds no basis whatsoever for concluding that their preparation of the fee request was "exceptional."

Lebron's reliance on the contingent nature of recovery is comparably flawed. Although the risk of nonrecovery has been identified as a factor sometimes warranting enhancement of the lodestar, *see, e.g., Copeland,* 641 F.2d at 892, the Court of Appeals for the District of Columbia Circuit has recently questioned the legitimacy of a contingency adjustment. *See. Laffey,* 746 F.2d at 28; *Murray,* 741 F.2d at 1430–31; *cf. Blum,* 465 U.S. at 901 n. 17, 104 S.Ct. at 1550 n. 17 (declining to decide whether contingency factor "may ever justify an upward fee adjustment"). Even if a contingency enhancement may be appropriate under § 1988, Lebron has failed to demonstrate that this is the exceptional case in which contingency enhancement "is necessary to facilitate the filing of meritorious claims." *Murray,* 741 F.2d at 1432. Weightman and Roth are public utility law attorneys who became involved in the case on a supposedly *pro bono* basis "because the case looked fascinating...." (Roth Aff. at 2.) Lebron has provided no evidence that the probability of success or failure ever entered into the decision to take the case. Rather, the decision here appears to have been based on the attorneys' desire to litigate an interesting First Amendment case. While Weightman and Roth are entitled to proper compensation for their efforts on behalf of Lebron, they have failed to persuade the Court that a contingency bonus is appropriate in this case.

Lebron correctly notes that a delay-in-payment adjustment may be awarded to reflect the fact that an attorney's customary billing rate generally assumes prompt payment upon the rendering of services, while fee-shifting statutes like § 1988 do not provide actual compensation until much later. *See Shaw v. Library of Congress,* 747 F.2d 1469, 1472 (D.C.Cir.1984), *rev'd on other grounds,* — U.S. —, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986); *Murray,* 741 F.2d at 1432; *Copeland,* 641 F.2d at 893. WMATA responds that a delay enhancement is inappropriate in this case because Lebron's attorneys' took the case on a *pro bono* basis and therefore realized at the outset that they would not receive payment, if ever, until the conclusion of the litigation. The Court must disagree. This circuit's standard is clear that when the attorney of a prevailing party seeks compensation at the same rate that the attorney billed other clients who paid promptly, the attorney may be awarded a delay adjustment. *See, e.g., Copeland,* 641 F.2d at 893. That condition is satisfied here, and this conclusion is unaltered by the fact that Weightman and Roth understood at the outset that fees would be received only at the conclusion of the case. When they accepted the case, the law provided for such delay adjustments, and, contrary to WMATA's suggestion, nothing in the record indicates that they waived their entitlement to a later adjustment. The hourly rates used to calculate the lodestar were the rates in effect at the time services were rendered, rather than the rates currently in effect. Accordingly, Lebron is entitled to a reasonable adjustment to reflect the delay in payment.

The Court finds Lebron's suggest 9.17 percent delay enhancement, based on the statutory post-judgment interest rate, to be excessive. This case is qualitatively different from the circumstances envisioned by that rate. Considering the prevailing economic conditions, as well as the contingent nature of Lebron's recovery of attorneys' fees, the Court concludes that a five percent per year enhancement would reasonably compensate Lebron's attorneys for the delay in payment. Accordingly, the lodestar is adjusted as follows:

| | | Enhancement | Total |
|---|---|---|---|
| Amount due through 12/84 | $34,466.25 | $1,723.31 | $36,189.56 |
| Amount due through 12/85 | 48,085.97[9] | 2,404.30 | 50,490.27 |
| Amount due through 12/86 | 50,490.27 | 2,524.51 | 53,014.78 |
| Amount due through 2/87 | 53,014.78 | 441.79 | 53,456.57 |

For the foregoing reasons, the Court finds that plaintiff is entitled to interim attorneys' fees in the amount of $53,456.57.

## Damages

Lebron also moves for summary judgment on his claim for damages. Although WMATA does not caption its opposition as a cross-motion for summary judgment, defendant includes no statement of material facts in genuine dispute and grounds none of its arguments on the need for additional testimony. Therefore, the Court will treat WMATA's opposition papers as a motion for summary judgment.

Lebron seeks damages for tangible, as well as intangible, injuries. Lebron's tangible claims are based on $1,100.75 in additional printing and shipping costs incurred solely due to WMATA's breach of the original contract to display his poster. WMATA concedes liability for these damages. Lebron's intangible claims are based on the effects of delayed presentation of his personal political message, and on the alleged emotional distress he suffered as a result of WMATA's unconstitutional conduct.[10] WMATA disputes liability for these intangible injuries.

■ A plaintiff may recover damages under 42 U.S.C. § 1983 for constitutional torts which inflict only intangible injuries. E.g., Halperin v. Kissinger, 606 F.2d 1192, 1207 (D.C.Cir.1979), aff'd in part and cert. dismissed in part, 452 U.S. 713, 101 S.Ct. 3132, 69 L.Ed.2d 367 (1981); Dellums v. Powell, 566 F.2d 167, 195 (D.C.Cir.1977), cert. denied, 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978). However, because recovery under § 1983 rests upon the principle of compensation, Carey v. Piphus, 435 U.S. 247, 255, 98 S.Ct. 1042, 1048, 55 L.Ed.2d 252 (1978), monetary recovery is limited to actual, demonstrable injuries; when injury is presumed, rather than proven, only nominal damages may be awarded. Id. at 266, 98 S.Ct. at 1054; Hobson v. Wilson, 737 F.2d 1, 59–60 (D.C.Cir.1984), cert. denied sub nom. Brennan v. Hobson, 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985); Doe v. District of Columbia, 697 F.2d 1115, 1123 & n. 16 (D.C.Cir.1983).

■ WMATA raises a number of challenges to Lebron's intangible damage claims, none of which prevents the Court from reaching the merits. First, WMATA contends that claims based on delay and emotional distress may not be entertained because they were not explicitly raised in the complaint. However, Lebron introduced evidence at trial on both issues, without objection. Under Fed.R.Civ.P. 15(b), the pleadings are considered to be amended to conform to the evidence presented at trial.[11] WMATA next argues that Lebron waived his damage claims by not raising them at trial or on appeal. This argument also must be rejected. Although Lebron presented very little evidence on damages at trial, he testified (without objection) to a modest degree of emotional distress, and Lebron's attorneys argued the need for timely display of the poster. Moreover, Lebron continued to refer to damage claims in his briefs before the Court of Appeals. While the primary attention of

9. Because the Court is unable to determine from Lebron's fee petition how much, if any, of the $6,177.66 in costs accrued in 1984, the full amount has been treated as fees that came due during 1985.

10. In addition to injunctive and declaratory relief, Lebron's amended complaint asked for $5,000 in contract damages, $250,000 in damages for intentional interference with Lebron's artistic career, $500,000 in punitive damages, and attorneys' fees and costs.

11. Additionally, it should be noted that the complaint's prayer for relief is not determinative of the plaintiff's optimal recovery. When the allegations of the complaint establish an entitlement to a particular remedy, a faulty prayer will not foreclose recovery. 5 C. WRIGHT & A. MILLER, Federal Practice and Procedure § 1255 (1969).

this Court and the Court of Appeals unquestionably was focused on the issue of injunctive relief, Lebron cannot be deemed to have waived his request for damages.

WMATA also questions whether the damage issues are properly before this court under the mandate of the Court of Appeals. WMATA claims that the mandate did not authorize this Court to consider the damage issues and that therefore the Court is precluded from addressing the issue. Actually, no formal mandate ever issued from the Court of Appeals following the decision on appeal. Pursuant to Fed.R. App.P. 41(a), the Clerk of the Court of Appeals transmitted to the Clerk of this Court a certified copy of the judgment and opinion of the Court of Appeals, in lieu of a formal mandate. Nowhere in either the judgment or the opinion does the Court of Appeals explicitly remand the case to this Court. Thus, in a strictly technical sense, jurisdiction over this matter apparently was never returned to this Court. However, the Court believes that a fair reading of the opinion of the Court of Appeals indicates that the circuit court did not intend to reject Lebron's damage claims *sub silentio,* and that justice would not be served by requiring the parties to seek formal clarification of the scope of the mandate.[12] Accordingly, the Court concludes that the damage claims are properly before the Court.[13]

However, WMATA also argues that even if this Court determines that the damage issues are within the scope of the presumed mandate, WMATA is immune from liability. First, WMATA claims that the Eleventh Amendment provides sovereign immunity from damage awards. Second, WMATA contends that § 1983 provides institutional damage immunity for the "good faith" constitutional torts of the institu-

tion's officials. Neither of these contentions is correct.

To the extent that WMATA, a corporation created by a congressionally-approved interstate compact, is entitled to claim Eleventh Amendment immunity, that immunity has been waived in this case. Section 80 of WMATA's enabling compact provides that WMATA "shall be liable for its contracts and for its torts ... committed in the conduct of any proprietary function, ... but shall not be liable for any torts occurring in the performance of a governmental function." Act of November 6, 1966, Pub.L. No. 89–774, 80 Stat. 1324, 1350 (codified at D.C.Code § 1–2431(80) (1981)). The rental of commercial advertising space is clearly a proprietary function. *See Lehman v. City of Shaker Heights,* 418 U.S. 298, 303–04, 94 S.Ct. 2714, 2717–18, 41 L.Ed.2d 770 (1974); *Gay Activists Alliance v. Washington Metropolitan Area Transit Authority,* 5 Media L.Rep. (BNA) 1404, 1406–07 (D.D.C.1979). Thus, WMATA, under the clear language of section 80, has waived its Eleventh Amendment immunity in this case.

WMATA's reference to the qualified immunity held by its officials in the exercise of their official duties also is misplaced. In *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), the Supreme Court addressed the claims of a municipal corporation seeking to avoid § 1983 liability on the ground that the officers involved had acted in good faith. The Supreme Court concluded that the city officials' good faith, while relevant to the individuals' liability, was irrelevant to the city's liability. *Id.* at 638, 100 S.Ct. at 1409. WMATA has waived sovereign immunity, and thus stands on the same footing as the city considered in *Owen.* Consequently, WMATA's attempt to bootstrap

---

**12.** To do so, of course, would start the "meter" running again and reopen the attorneys' fee dispute. Unfortunately, this is one reason why cases such as this so often seem to acquire lives of their own.

**13.** Were it not for the fact that the damage issues are before the Court on plaintiff's motion for summary judgment, the Court might be forced to resolve the more difficult issue of

whether the Court of Appeals expected or authorized additional evidentiary hearings on the damage claims. The Court has no need to reach this question, because plaintiff's motion necessarily implies a belief that all material facts are already before the Court. *Cf.* Fed.R.Civ.P. 56(c) (summary judgment appropriate only when "no genuine dispute as to any material fact").

immunity from the good faith of its officials must be rejected.

The Court now addresses the merits of Lebron's damage claims. As noted above, Lebron advances two grounds for compensatory relief: delay in exercise of his First Amendment rights and emotional distress. Each is a proper basis for damage relief. *See Halperin,* 606 F.2d at 1208 (D.C.Cir.1979) (emotional distress and mental anguish); *Dellums,* 566 F.2d at 195 (choice of time, place, and manner of demonstration). Thus, Lebron is entitled at least to nominal damages. The issue to be resolved is whether Lebron has sufficiently proved the existence of actual damage.

Throughout his dealings with WMATA, Lebron stressed the importance to him of timely display of his poster. At trial, Lebron testified that he believed it was important that the poster be displayed as early in the 1984 presidential campaigns as possible. Even with expedited review, Lebron experienced a three-month delay. The Court has no doubt that Lebron wished to have his poster displayed sooner, rather than later. The difficulty is that Lebron has failed to provide a reasonable basis upon which to calculate—with any degree of certainty—the damage caused by the delay. Lebron suggests that the Court use the monthly rental rate for the display space, but suggests no rational relationship between that rate and the value of having his message displayed three months later than he wished. Therefore, the Court holds that Lebron has failed, on the record presented, to establish more than nominal damages of $1. To award more would be to engage impermissibly in "pure speculation" in valuation. *See Hobson,* 737 F.2d at 62.

The Court reaches a similar conclusion with regard to Lebron's claim of emotional distress. The only evidence presented at trial to support this claim was Lebron's brief testimony on his reaction to WMATA's rejection of his poster on the basis of its conclusion that it was deceptive. He stated:

I was quite angry because, as I said before, I had already spent money going to the production. I had gotten certain momentum going in terms of writing press releases, leading to the invitations, announcements. It seemed to me very capricious the way they went into—I speculated as to what other intentions might have been behind that.

It was very emotionally deflating because it came across as a slap in the face. At least that is what it felt like. It made me feel like I was not being taken seriously when I was trying to take every effort to insure that I was playing by the rules of the game as much as possible.

Although WMATA did not object to or challenge this testimony at trial, the Court concludes that these six sentences simply are insufficient to support a claim for mental anguish. Accordingly, again Lebron is entitled to nominal damages of $1.

Lebron suggests that in addition to the goal of compensation, the Court should consider the need to deter WMATA from committing future First Amendment violations. There is some support in the case law for the proposition that the amount of damages awarded for constitutional torts may be informed by a policy of deterrence. *See Halperin,* 606 F.2d at 1208. In *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), however, the Supreme Court flatly rejected deterrence as an independent basis for institutional damage liability under § 1983. In holding that a municipal corporation is immune from punitive damage liability under § 1983, the Court suggested that sufficient deterrence could be obtained by holding institutions liable for all compensatory damages and by permitting punitive damage awards against individual officials who act knowingly and maliciously. *Id.* at 267–68. Accordingly, the Court will serve the deterrent purposes of § 1983 by requiring WMATA to compensate Lebron for all proven damages, and by awarding nominal damages for the other minimal wrongs. What the Court may not do, though, is award damages (to plaintiff's profit) simply to deter WMATA from committing a future First Amendment violation.

*Conclusion*

Plaintiff's fee petition will be accepted, as modified, and plaintiff's motion for summary judgment on his damage claims will be granted in part and denied in part. Plaintiff is entitled to $53,673.35 in attorneys' fees and $1,102.75 in compensatory damages.